1  **LEWIS BRISBOIS BISGAARD & SMITH LLP**
   KATHLEEN M. WALKER, SB# 156128
2    Email: Kathleen.Walker@lewisbrisbois.com
   633 West 5th Street, Suite 4000
3  Los Angeles, California 90071
   Telephone: 213.250.1800
4  Facsimile:  213.250.7900

5  **LEWIS BRISBOIS BISGAARD & SMITH LLP**
   LANN G. McINTYRE, SB# 106067
6    Email: Lann.McIntyre@lewisbrisbois.com
   RITA R. KANNO, SB# 230679
7    Email: Rita.Kanno@lewisbrisbois.com
   550 West C Street, Suite 1700
8  San Diego, California 92101
   Telephone: 619.233.1006
9  Facsimile:  619.233.8627

10 Attorneys for Defendants AG REDLANDS LLC, dba HIGHLAND CARE CENTER OF REDLANDS, AG FACILITIES OPERATIONS, LLC, and JACOB WINTNER

11              UNITED STATES DISTRICT COURT

12            CENTRAL DISTRICT OF CALIFORNIA

13

14 DIGNA BARREIRO, deceased, by and through     Case No.  5:21-cv-01329
   her personal legal representative and successor in
15 interest, DANIEL BATLLE; and DANIEL          **DEFENDANTS' NOTICE OF REMOVAL**
   BATLLE, individually,                        **OF ACTION TO FEDERAL COURT**
16                                              **PURSUANT TO 28 U.S.C. §§ 1331, 1441,**
                                                **1442 AND 1446**
17              Plaintiffs,

18 vs.

19 AG REDLANDS LLC dba HIGHLAND CARE
   CENTER OF REDLANDS, a California Skilled Nursing
20 Facility; AG FACILITIES OPERATIONS, LLC, a
   limited liability company; JACOB WINTNER, an
21 Individual; DOES 1-25, inclusive,
22
23              Defendants.
24

25      **TO THE HONORABLE COURT, PLAINTIFFS HEREIN, AND THEIR**

26 **COUNSEL OF RECORD:**

27      **PLEASE TAKE NOTICE** that on August 6, 2021, Defendants AG REDLANDS

28 LLC, dba HIGHLAND CARE CENTER OF REDLANDS, AG FACILITIES OPERATIONS,

LLC, and JACOB WINTNER (collectively "Defendants," and/or "AG Redlands," or "Mr. Wintner"), by and through its counsel files this Notice of Removal. This is a civil action over which this Court has original jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1442, and it is one that may be properly removed to this Court pursuant to 28 U.S.C. § 1441. Pursuant to 28 U.S.C. § 1446(a), Defendants assert the following grounds in support of its Notice of Removal:

## I.   PLEADINGS RELATED TO REMOVED CASE

1.   This action was initially filed on or about June 4, 2021, in the Superior Court of California, County of San Bernardino, entitled *Digna Barreiro, deceased, by and through her personal legal representative and successor in interest, Daniel Batlle; and Daniel Batlle, individually v. AG Redlands LLC dba Highland Care Center of Redlands, a California Skilled Nursing Facility; Ag Facilities Operations, LLC, a limited liability company; Jacob Wintner, an Individual; DOES 1-25, inclusive* San Bernardino County Superior Court Case No. CIVSB2116544.

Pursuant to 28 U.S.C. §1446(a), true and correct copies of all process, pleadings and orders received by Defendants in the Superior Court action are attached hereto as **Exhibit A**.

## II.   REMOVAL IS TIMELY

2.   Defendants first received a copy of the complaint on July 16, 2021. **Exhibit A**. This Notice of Removal is filed within thirty (30) days of service upon Defendant of the lawsuit; therefore, the Notice is timely pursuant to 28 U.S.C. § 1446(b). *See Romulus v. CVS Pharmacy, Inc.*, 770 F.3d 67 (1st Cir. 2014); *See Chavarria v. Mgmt. & Training Corp.*, No. 16-cv-617-H (RBB), 2016 U.S. Dist. LEXIS 197047, at *6 (S.D. Cal. May 13, 2016) (indicating first 30-day-time-period is triggered if the basis of removal is clear from initial pleading).

3.   Concurrent with the filing of this Notice, Defendants are serving this Notice of Removal upon Plaintiffs and filing a copy of this Notice of Removal with

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4826-6732-4404.1

2

DEFENDANTS' NOTICE OF REMOVAL OF ACTION TO FEDERAL COURT

1  the Clerk of the Superior Court of the County of San Bernardino pursuant to 28 U.S.C.

2  § 1446(d).

## III.   VENUE IS PROPER IN THIS COURT

4         4.    Removal to the United States District Court for the Central District of

5  California is proper because the state action was filed in the Superior Court of the

6  State of California for the County of San Bernardino, as referenced in paragraph 1,

7  above. Accordingly, this Court is the appropriate venue for filing this Notice of

8  Removal pursuant to 28 U.S.C. § 1441(a) and 28 U.S.C. § 1446(a).

## IV.   JURISDICTION EXISTS UNDER 28 U.S.C. § 1331 BASED ON THE PREP ACT

11        5.    This is a civil action over which the Court has original jurisdiction

12 under 28 U.S.C. §§ 1331 and is one that may be removed to this Court pursuant to 28

13 U.S.C. §§ 1441 and 1446 based on federal question jurisdiction.

14        6.    Plaintiffs' Complaint alleges that the fact that Defendants failed to have

15 the appropriate infection protocols in place, when Decedent Digna

16 Barreiro ("Decedent" or "Ms. Barreiro"), a resident of Highland Care Center, became

17 infected with COVID-19, which ultimately led to her death on May 2, 2020. (**Exhibit

18 A**, pg. 2.) Plaintiffs allege that Defendants failed to implement effective infection

19 control policies and failed to either maintain or train staff in the proper infection

20 control mechanisms. Plaintiffs further claim Defendants failed to implement, and

21 adhere to government guidelines on how to protect and treat Decedent in light of the

22 risk of COVID-19. (**Exhibit A**, ¶¶ 45-52, 58-61, 65-67, 71-74, 85, 89.) These claims

23 by their very nature include the use of covered countermeasures which are the

24 centerpiece of an infection control program used to prevent COVID-19. (See

25 Defendants' RFJN Exhibits 9, 32.)

26        7.    Plaintiffs allege Defendants are culpable for the way it employed CDC

27 guidelines to protect and treat Plaintiffs against infection from COVID-19, for failing

28 to take all reasonable and necessary precautions to ensure decedent did not contract

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

3

DEFENDANTS' NOTICE OF REMOVAL OF ACTION TO FEDERAL COURT

COVID-19 (in other words, Plaintiffs seeks to hold Defendants liable for its decisions directly relating to the delivery, distribution, and dispensing of countermeasures to combat COVID-19), for failing to test residents for COVID-19 and for improperly distributing, administering and utilizing equipment and supplies which are designated countermeasures to combat the COVID-19 outbreak, including but not limited to items identified as personal protective equipment. Therefore, Plaintiffs' claims fall under the Public Readiness and Emergency Preparedness Act, 42 U.S.C. §§ 247d-6d and 247d-6e (2006) (the "PREP Act"), the applicability of which presents a significant Federal Question relating to the ongoing national emergency and COVID-19 pandemic. (**Exhibit A**, generally and ¶¶ 45-52, 58-61, 65-67, 71-74, 85, 89.)

8.     The PREP Act and the Preparedness Act for Medical Countermeasures Against COVID-19, 85 Fed. Reg. 15198 (Mar. 17, 2020) are federal statutes that apply specifically to healthcare providers such as Defendants in its purchase, administration, allocation, dispensing, prescribing, distribution and use of countermeasures to prevent or mitigate the spread of COVID-19.

9.     The PREP Act provides for exclusive Federal jurisdiction and an exclusive Federal cause of action for a suit against a covered person. Complete preemption exists when: (1) the statute relied upon by Defendant as preemptive contains civil enforcement provisions within the scope of which Plaintiffs state law claims fall; and (2) there is a "clear indication of Congressional intention to permit removal despite the Plaintiffs exclusive reliance on state law." *Railway Labor Executives Ass'n v. Pittsburgh & Lake Erie R.R.* Co., 858 F.2d 936, 942 (3rd Cir. 1988) citing *Franchise Tax Bd. of State of Calif. v. Construction Laborers Vacation Trust for Southern Calif.*, 463 U.S. 1, 24 (1983). (*See also* Defendants' RFJN Exhibits 31, 32.)

10.     Defendants' purchasing, administration, dispensing, prescribing, distribution and use of countermeasures, such as facemasks and other PPE and testing equipment to prevent or mitigate the spread of COVID-19, which forms the basis of

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

this action, presents a federal question under the PREP Act giving this Court original jurisdiction completely preempting all state law claims asserted by Plaintiffs in the Complaint. 42 U.S.C. § 247d-6d. Defendants and its staff were acting as qualified persons employed for the purpose of developing and implementing policies, procedures, and other countermeasures to prevent, limit, and/or control spread of COVID-19. Defendants and its staff are also covered persons authorized to administer FDA approved COVID-19 devices, tests and medications use to treat the same.

11.     While a Plaintiff is ordinarily entitled to choose a state or federal forum, "a Plaintiffs may not defeat federal subject-matter jurisdiction by omitting to plead necessary federal questions", i.e., "artful pleading." *Rivet v. Regions Bank of La.*, 522 U.S. 470, 475. "If a court concludes that a Plaintiffs has 'artfully pleaded' claims in this fashion, it may uphold removal even though no federal question appears on the face of Plaintiffs' complaint. The artful pleading doctrine allows removal where federal law completely preempts Plaintiffs' state-law claim." *Id.* "The artful pleading rule applies when Congress has either (1) so completely preempted, or entirely substituted, a federal law cause of action for a state one that Plaintiffs cannot avoid removal by declining to plead necessary federal questions, or (2) expressly provided for the removal of particular actions asserting state law claims in state court." *Romano v. Kazacos*, 609 F.3d 512, 519 (2d Cir. 2010) (internal citations and quotations omitted).

12.     Complete preemption exists when the preemptive force of federal law is so powerful that it displaces any state law cause of action and leaves room only for a federal claim for purposes of the "well-pleaded complaint" rule. *Metropolitan Life Ins. Co. v. Taylor*, 481 U.S. 58, 63-64 (1987); *see also NASDAQ OMX Group, Inc. v. UBS Securities, LLC*, 770 F.3d 1010 (2d Cir. 2014).

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4826-6732-4404.1

5

DEFENDANTS' NOTICE OF REMOVAL OF ACTION TO FEDERAL COURT

**A.    The PREP Act and the Corresponding Declaration of the HHS Secretary for the COVID-19 Pandemic and Advisory Opinions**

13.    The PREP Act provides immunity from suit and liability as well as additional protections for claims relating to the use and administration of pandemic and epidemic products and security countermeasures. The PREP Act is applicable with respect to a "covered countermeasure," which definition includes: "(1) a qualified pandemic or epidemic product (as defined in § 247d-6d (i) (7)) . . . or (4) a respiratory protective device that is approved by the National Institute for Occupational Safety and Health ("NIOSH") and that the Health and Human Service Secretary determines to be a priority for use during a public health emergency declared under section 247d." 42 USC § 247d-6d (i) (1).

14.    Specifically, this legislation empowers the Secretary of Health and Human Services (HHS) to issue a written declaration and provide that a "covered person shall be immune from suit and liability under Federal and State law with respect to all claims for loss caused by, arising out of, relating to, or resulting from the administration to or the use by an individual of a covered countermeasure" during a health emergency. 42 U.S.C. § 247d-6d(a)(1). Also, 28 U.S.C. § 247d-6d(b)(8) states that "no State or political subdivision of a State may establish, enforce, or continue in effect with respect to a covered countermeasure any provision of law or legal requirement that is different from, or in in conflict with, any requirement applicable under this section" and relates to, among other things, use or administration of a covered countermeasure."

15.    On March 10, 2020, United States Health and Human Services Secretary issued a Declaration invoking the PREP Act for the COVID-19 pandemic. The Declaration was effective as of February 4, 2020. (*See* Defendants' RFJN Exhibit 2.) In the initial Declaration, Secretary Azar declared that "Administration of Covered Countermeasures means physical provision of the countermeasures to recipients, ***or activities and decisions directly relating to public and private delivery, distribution,***

***and dispensing of the countermeasures to recipients; management and operation of countermeasure programs; or management and operation of locations for purpose of distributing and dispensing countermeasures***." [Emphasis added.]

16.     The Secretary Azar subsequently issued an Amended Declaration under the PREP Act, which was effective as of March 27, 2020. (*See* Defendants' RFJN Exhibit 3.) The Amendment added respiratory protective devices approved by NIOSH (National Institute for Occupational Safety and Health) as a covered countermeasure under the PREP Act. On June 4, 2020, the Secretary further amended the March 10, 2020 Declaration to clarify that covered countermeasures under the Declaration include qualified products that limit the harm COVID-19 might otherwise cause. This Amendment was effective as of February 4, 2020. (*See* Defendants' RFJN Exhibit 4.) 85 FR 21012.[1]

**B.      Federal Question Jurisdiction is Proper Under the Doctrine of Complete Preemption**

17.     On December 3, 2020, the Secretary issued a Fourth Amended Declaration under the PREP Act, effective as of February 4, 2020. (*See* Defendants' RFJN Exhibit 5, December 3, 2020 Fourth Amended Declaration of Health and Human Services Secretary Azar Under the Public Readiness and Emergency Preparedness Act for Medical Countermeasures Against COVID-19.)

18.     The Secretary's Fourth Amended Declaration provides that "***COVID-19 is an unprecedented global challenge that requires a whole-of-nation response that utilizes federal, state, and local-distribution channels as well as private-distribution channels. Given the broad scale of this pandemic, the Secretary amends [Section VII of] the Declaration to extend PREP Act coverage to additional private-distribution channels***...." [Emphasis added.] (See Page 12 of Defendants' RFJN Exhibit 5.)

---

[1] *See* also Families First Coronavirus Response Act, H.R. 6201, 116th Cong. § 6005 (2020).

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

19.     The Fourth Amended Declaration specifically provides that Section VII of the Declaration is amended to extend liability protection under the PREP Act to Covered Persons for Recommended Activities that are related to: "Covered Countermeasures that are:

>    a.     Licensed, approved, cleared or authorized by the FDA (or that are permitted to be used under an Investigational New Drug Application or an Investigational Device Exemption) under the FD&C Act or PHS Act to treat, diagnose, cure, prevent, mitigate, or limit the harm from COVID-19, or the transmission of SARS-CoV-2 or a virus mutating therefrom; or
>
>    b.     A respiratory protective device approved by NIOSH under 42 CFR part 84, or any successor regulations, that the Secretary determines to be priority for use during a public health emergency declared under section 319 of the PHS Act to prevent, mitigate, or limit the harm from COVID-19, or the transmission of SARS-CoV-2 or a virus mutating therefrom." Defendants' RFJN- Exhibit 5, 85 Fed. Reg. 79194, 79196-97.[2]

20.     The Fourth Amended Declaration further makes explicit that there can be situations where a decision *not* to administer a Covered Countermeasure to a particular individual can equate to the administration of a countermeasure to an individual under the PREP Act. For example, ***"[p]rioritization or purposeful allocation of a Covered Countermeasure, particularly if done in accordance with a public health authority's directive, can fall within the PREP Act and this Declaration's liability protections.***" Defendants' RFJN Exhibit 5, 85 Fed. Reg. 79194, 79197, Amendment to Section IX of the Secretary's Declaration (emphasis added).

---

[2] Moreover, attached as Appendix A to Advisory Opinion is a list of the "covered countermeasures" for which emergency use authorizations have been issued by the United States Food and Drug Administration. (*See* Exhibits 5 and 10 to Defendants' RFJN.) The list includes twelve pages of COVID-19 test kits, and provides that face shields, gowns, shoe covers, non-surgical isolation gowns, surgical caps, properly labeled non-surgical masks, and certain non-NIOSH approved respirators are covered by an EUA. Surgical masks are not listed; however, such masks are Class II medical devices which are cleared by the FDA for use. (*See* 21 CFR 878.4040). Thus, COVID-19 testing kits, face masks, gowns, gloves and other PPE are "qualified pandemic or epidemic products" and "covered countermeasures" under the PREP Act, as such products are either FDA cleared/approved or are included in an EUA.

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

21.     In addition, the Fourth Amended Declaration provides that *the Declaration must be construed in accordance with the Department of Health and Human Services (HHS) Office of the General Counsel (OGC) Advisory Opinions on the Public Readiness and Emergency Preparedness Act and the Declaration ("Advisory Opinions"). The Declaration incorporates the Advisory Opinions for that Purpose*. Defendants' RFJN Exhibit 5, 85 Fed. Reg. 79192, 79194-95 (emphasis added). Thus, the Fourth Amended Declaration incorporates all the Advisory Opinions related to COVID-19 and the PREP Act into the Secretary's March 10, 2020 initiating Declaration, affording them *Chevron* controlling weight. Where Congress has expressly delegated interpretive authority to an agency, that agency's interpretative proclamations are controlling on the federal courts. *See Chevron USA, Inc. v. Natural Resources Defense Council, Inc.*, 467 US 837, 843-844 (1984). Moreover, section (b)(7) of the PREP Act provides that "[n]o court of the United States, or of any state, shall have subject jurisdiction to review whether by mandamus or otherwise, any action by the Secretary under this subsection."

22.     The Fourth Amended Declaration also directly acknowledges the federal interests in cases requiring interpretation and application of the PREP Act:

> "COVID-19 is a global challenge that requires a whole-of-nation response. **There are substantial federal legal and policy issues, and substantial federal legal and policy interests within the meaning of *Grable & Sons Metal Products, Inc. v. Darue Eng'g. & Mf'g.*, 545 U.S. 308 (2005), in having a unified, whole-of-nation response to the COVID-19 pandemic among federal, state, local, and private-sector entities.**"

*See* Defendants' RFJN Exhibit 5, 85 Fed. Reg. 79191, 79197 (emphasis added).

23.     The Fourth Amended Declaration confirms the interpretation of the PREP Act is a matter of significant federal concern, and that removal of any case involving the interpretation of that Act is proper in accordance with the Supreme Court holding in *Grable*.

> The world is facing an unprecedented pandemic. To effectively respond, there must be a **more consistent** pathway for Covered Persons to manufacture, distribute, **administer** or use Covered Countermeasures

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4826-6732-4404.1

9

DEFENDANTS' NOTICE OF REMOVAL OF ACTION TO FEDERAL COURT

across the nation and the world. Thus, there are substantial federal legal and policy issues, and substantial federal legal and policy interests within the meaning of *Grable & Sons Metal Products, Inc. v. Darue Eng'g. & Mf'g.*, 545 U.S. 308 (2005), in having **a uniform interpretation of the PREP Act**. [Emphasis added.]

*See* Defendants' RFJN Exhibit 5, 85 Fed. Reg. 79191, 79197 (emphasis added).

24.    Moreover, on January 8, 2021, HHS, Office of the General Counsel, issued Advisory Opinion 21-01, which further confirms that the PREP Act can be triggered even in cases of non-use of a covered countermeasure when the non-use is the result of a conscious decision, including, as just one example, a decision relating to the prioritization or purposeful allocation of a countermeasure and "particularly if done in accordance with a public health authority's directive." According to the opinion, the view that the PREP Act does not encompass alleged omissions to use covered countermeasures "clashes with the plain language of the PREP Act, which extends immunity to anything 'relating to' the administration of a covered countermeasure." (*See* Defendants' RFJN, Exhibit 9, pgs. 2-3.)  In the opinion, HHS indicates *that the PREP Act is triggered in cases where a Plaintiffs alleges a failure to use PPE*, *if the failure was the outcome of some form of decision-making process.* (*See* Defendants' RFJN Exhibit 9, pg. 3.) The Advisory Opinion further provides that the PREP Act **is a complete preemption statute** in that the "sine qua non of a statute that completely preempts is that it establishes either a federal cause of action, administrative or judicial, as the only viable claim or vests exclusive jurisdiction in a federal court. The PREP Act does both." (*See* Defendants' RFJN, Exhibit 9, pgs. 2-3.)

25.    The United States concurred, filing a Statement of Interest in *Bolton v. Gallatin Center for Rehabilitation & Healing, LLC*, Case 3:20-cv-00683 (M.D. Tenn.) The United States likewise asserts **the PREP Act is a complete preemption statute** with respect to the administration or use of covered countermeasures. **"Two key provisions of the PREP Act operate together to demonstrate its completely**

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

**preemptive nature: the immunity provision and the exclusive alternative remedy provision**." (*See* Defendants' RFJN Exhibit 31.)

26.    In a recent United States District Court order issued on April 30, 2021, *Rachal v. Natchitoches Nursing & Rehab Center LLC*, Civil Docket No. 1:21-CV-00334 (W.D. La. April 30, 2021), the court concluded that the PREP Act is a complete preemption statute, akin to the Air Transportation Safety and System Stability Act ("ATSSSA"). Furthermore, number of other similar statutes to PREP Act have been held to establish complete preemption and original federal jurisdiction:

**Labor Management Relations Act ("LMRA").** The Supreme Court has adjudged the LMRA to be a complete preemption statute. Thereunder, any state law claims that are substantially dependent on analysis of a collective-bargaining agreement are preempted by section 301 of the LMRA and must be brought in federal court. *Caterpillar Inc. v. Williams*, 482 U.S. 386, 393 (1987). However, before an employee may bring a Section 301 claim in court, the employee must "'at least *attempt to exhaust exclusive grievance and arbitration procedures* established by the [collective] bargaining agreement.'" *Campbell v. Kane, Kessler, P.C.*, 144 F. App'x 127, 130 (2d Cir. 2005) (quotation omitted) [Emphasis added.]

**Employee Retirement Income Security Act ("ERISA***).* ERISA, another complete preemption statute, also has a "firmly established federal policy favoring exhaustion of administrative remedies" for purposes of, *inter alia*, reducing the number of frivolous lawsuits, providing a non-adversarial method of claims settlement and minimizing the costs of claims settlement for all. *Kennedy v. Empire Blue Cross & Blue Shield*, 989 F.2d 588, 594 (2d Cir.1993); *Paese v. Hartford Life & Acc. Ins. Co.*, 449 F.3d 435, 445 (2d Cir. 2006).

**Air Transportation Safety and System Stability Act ("ATSSSA").** The Second Circuit has also applied the doctrine of complete preemption to the ATSSSA, which is structurally similar to the PREP Act. Congress passed the ATSSSA after the September 11th terrorist attacks to create an exclusive federal cause of action for

damages "arising out of the hijacking and subsequent crashes" of the aircraft used in the attacks. ATSSSA § 408(b)(1), 49 U.S.C. § 40101. Like the PREP Act, the ATSSSA also includes a victim's compensation fund, where a claim is filed with an appointed "Special Master," who reviews the claim to determine whether the claimant is an eligible individual under the Act. ATSSSA § 405; 49 U.S.C. § 40101. Claims are limited under the fund and do not include punitive damages awards. Similar to the PREP Act, Congress' principal goals in enacting the ATSSSA "were to provide relief *without litigation* to individuals harmed as a result of the crashes and to *limit the liability of entities* that were likely to be sued for injuries suffered in connection with the crashes." *In re WTC Disaster Site*, 414 F.3d 352, 377 (2d Cir. 2005) [Emphasis added].[3]

**Federal Tort Claims Act ("FTCA").** The FTCA, which is strikingly similar to the PREP Act, immunizes certain persons from liability and also provides an administrative/judicial remedial scheme for claims falling thereunder. The FTCA affords liability protection to federal employees for any negligent or wrongful acts committed while acting within the scope of their employment, and provides an exclusive federal cause of action in the federal district courts against the United States under specified circumstances. Like the PREP Act, before a judicial action may be instituted, the claimant must first present the claim before the appropriate federal agency for adjudication. 28 U.S.C. § 2675. This jurisdictional requirement cannot be waived, *Celestine v. Mount Vernon Neighborhood Health Ctr.*, 403 F.3d 76, 82 (2d Cir. 2005), resulting in the dismissal of claims where a claimant fails to exhaust the administrative remedies. *See, e.g., Leytman v. United States*, No. 19-3929, 2020 WL 6297440, at *2 (2d Cir. Oct. 28, 2020) [affirming dismissal of pending and unexhausted claims under FTCA for lack of subject matter jurisdiction]. Indeed, the

---

[3] Notably, the PREP Act shares operative language with the ATSSSA. Compare *In re WTC Disaster Site*, 414 F.3d, at 375-76 [discussing the breadth and meaning of the operative phrases "arising out of" "resulting from" and "relating to"] with 42 U.S.C. § 247d-6d(a)(1).

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4826-6732-4404.1

12

DEFENDANTS' NOTICE OF REMOVAL OF ACTION TO FEDERAL COURT

federal remedy under the FTCA, similar to the PREP Act, ensures that "decisions and conduct of federal public servants in the course of their work *will not be adversely affected by fear of personal liability* for money damages and of the burden of defending damage liability claims." *Melo v. Hafer*, 13 F.3d 736, 744 (3d Cir. 1994) (Emphasis added).

27.     Like the statutes discussed above, the PREP Act further establishes an exclusive federal remedy and cause of action for all claims relating to covered countermeasures, as well as the procedures applicable to such actions/claims. Under 42 U.S.C. § 247d-6d(d)(1), "the sole exception to the immunity from suit and liability of covered persons … shall be for an exclusive Federal cause of action against a covered person for death or serious physical injury proximately caused by willful misconduct." For claims that do not assert "willful misconduct," the exclusive remedy for relief is established under § 247d-6e, which permits an individual to claim no-fault benefits through the Covered Countermeasure Process Fund for a "covered injury directly caused by the administration or use of a covered countermeasure." Simply put, state causes of action for claims relating to covered countermeasures **are impermissible** as a claimant must either file a claim through the established fund or a Complaint for Willful Misconduct under the PREP Act in the District Court for the District of Columbia. Thus, the PREP Act substitutes an exclusive federal cause of action and federal claims process in place of all state claims relating to the use and administration of covered countermeasures.

28.     The PREP Act further sets forth the procedures for suit. Pursuant to subsection (e)(1), titled "**Exclusive Federal Jurisdiction**," any action for Willful Misconduct must be filed in the U.S. District Court for the District of Columbia. Such claims are also subject to heightened pleading requirements (i.e., requirement that claims are to be plead pleading with particularity) and verification of and submission of a physician declaration in support of the complaint; and are assigned to a three-judge panel which has jurisdiction to consider motions to dismiss and motions for

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

summary judgment. 42 U.S.C. § 247d-6d(e)(1), (e)(3) (e)(4) and (e)(5). Moreover, pursuant to section 247d-6d(e)(10),

> *The United States Court of Appeals for the District of Columbia Circuit shall have jurisdiction of an interlocutory appeal by a covered person taken within 30 days of an order denying a motion to dismiss or motion for summary judgment based on an assertion for the immunity from suit conferred by subsection (a) or based on an assertion of the exclusion under subsection (c)(5)*. (Emphasis added.)

Hence, the PREP Act sets up an exclusive cause of action for the claims asserted by Plaintiffs and the procedures and remedies governing the cause of action.

29.     For claims for no-fault benefits through the Covered Countermeasure Process Fund, 42 U.S.C § 247d-6 sets forth the procedure for obtaining such no-fault benefits. Thus, the PREP Act clearly satisfies the *Beneficial* test for "complete preemption" analysis.

30.     The Central District Court of California addressed the January 8, 2021 Advisory Opinion and concluded that removal is proper because the PREP Act is a complete preemption statute. On February 10, 2021, in *Garcia v. Welltower OpCo Group LLC*, No. 8:20-CV-02250, at *8-9 (C.D. Cal. Feb. 10, 2021), the court denied the motion to remand, holding that the PREP Act has complete preemptive effect after analyzing the relevant law and also affording deference to the Advisory Opinion. *Id.* at p. 10. (*See* Defendants' RFJN Exhibit 32.)

31.     Under the PREP Act, Congress has provided an exclusive federal remedy and exclusive federal jurisdiction for the substance of the allegations and relief sought in the Complaint thereby completely preempting State law with respect to the claims raised in the Complaint regarding Defendants' use and administration of countermeasures, such as facemasks and other PPE, and COVID-19 testing, to diagnose, treat, prevent or mitigate the spread of COVID-19.

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4826-6732-4404.1

14

DEFENDANTS' NOTICE OF REMOVAL OF ACTION TO FEDERAL COURT

## V.    THE PREP ACT APPLIES BECAUSE DEFENDANTS ARE COVERED PERSONS UNDER THE STATUTE

32.    The PREP Act applies to "Covered Persons" who administer or use a "Covered Countermeasure" during a "Recommended Activity" in relation to COVID-19. 42 U.S.C. § 247d-6d.

33.    A "covered person" includes a person or entity that "is a qualified person who prescribed, administered, or dispensed" or is a program planner of COVID-19 Countermeasures and "an official, agent or employee of a person or entity therein described." 42 U.S.C. § 247d-6d(i)(2)(B)(iv) and (v).

34.    The PREP Act defines a "person" as an individual, partnership, corporation, association, entity, or public or private corporation, including a federal, state or local government agency or department." 42 U.S.C. § 247d-6d(i)(5).

35.    A "qualified person" is defined as a "licensed health professional or other individual who is authorized to prescribe, administer, or dispense such countermeasures under the law of the State in which the countermeasure was prescribed, administered, or dispensed." 42 U.S.C. § 247d-6d(i)(8).

36.    The term "program planner" includes persons/entities "who supervised or administered a program with respect to the administration, dispensing,... provision, or use of a . . . qualified pandemic product or epidemic product, including a person who has established requirements, provided policy guidance, or supplied technical or scientific advice or assistance or provides a facility to administer or use a covered countermeasure in accordance with a [HHS Secretary's] declaration… " 42 U.S.C. § 247d-6d (i)(6).

37.    A private sector employer or other person can be a "program planner" when it carries out prescribed activities. (*See* Defendants' RFJN Exhibit 2, March 10, 2020 Declaration Under the Public Readiness and Emergency Preparedness Act for Medical Countermeasures Against COVID-19, Federal Register, Vol. 85, No. 52, pg. 15199.) In its letter dated August 14, 2020, HHS stated that a "senior living

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

community" meets the definition of a "program planner" to the extent that it supervises or administers a program with respect to the administration, dispensing, distribution, provision or use of a qualified pandemic or epidemic product, including the provision to a facility to administer or use a covered countermeasure. (*See* Exhibit 6 to Defendants' RFJN.)

38.     The broad definition of "program planner" was also addressed in Advisory Opinion 20-04, issued on October 22, 2020. (*See* Exhibit 7 to Defendants' RFJN.)

39.     Defendants were acting as a "program planner" and "qualified person." AG Redlands is a skilled nursing care facility for the elderly licensed by the California Department of Public Health, which employs licensed nursing personnel who are authorized to prescribe, administer, or dispense the covered countermeasures set forth in Plaintiffs Complaint (i.e., PPE including facemasks, gloves, gowns, face shields, N95 masks, and COVID-19 testing) under the laws of the State of California.

40.     During the time frame relevant to Plaintiffs Complaint, there was scarcity of PPE and COVID-19 testing kits and resources. (85 Fed. 17592–Notice of Designation of Scarce Material, and https://www.bloomberg.com/news/articles/2020-04-07/coronavirus-testing-accuracy-and-availability-shortages-remain.) Further, Defendants were "program planners" since it supervised or administered a program with respect to the administration, dispensing, distribution, provision or use of a qualified pandemic or epidemic products, which included decisions pertaining to the allocation and administration of covered countermeasures such as PPE, testing, etc., including how best to optimize supplies and when use is appropriate. Defendants' actions with respect to the coordination and implementation of its infection control program thus, inherently involved conscious decision making, including, but not limited to, the prioritization and purposeful allocation of covered countermeasures, including COVID-19 testing and PPE.

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

41.     This case does not involve nonfeasance or total inaction but instead relates to propriety of the countermeasures implemented by Defendants, including those pertaining to PPE and COVID-19 testing. Defendants have thus established that PREP Act applies to Plaintiffs claims thereby providing Defendants with complete preemption as well as immunity under the Act.

**VI.     THE PREP ACT APPLIES AS THERE IS A CAUSAL CONNECTION BETWEEN THE USE AND ADMINISTRATION OF COVERED COUNTERMEASURES BY DEFENDANTS AND THE INJURIES PLED HERE**

42.     The PREP Act "applies to **any claim for loss that has a causal relationship with the administration to or use by an individual of a covered countermeasure, including a causal relationship with the** . . . distribution . . . **purchase, donation, dispensing, prescribing, administration, licensing, or use of such countermeasure**." [Emphasis added.] 42 USC § 247d-6d (a)(2)(B).

43.     Here, Plaintiffs claims fall under the PREP Act in that they relate to the covered countermeasures taken by Defendants to prevent or mitigate the spread of COVID-19 and its decision making related thereto and relating to the management and operation of its countermeasure program, which includes the use of facemasks and other PPE, medication and testing. Each cause of action in the Complaint is based on Plaintiffs underlying theory that Defendants failed to exercise ordinary care to keep the premises, residents, and approaches safe by inadequately taking and enforcing precautions, providing, administering, and distributing PPE and other countermeasures. As referenced in Plaintiffs Complaint, the precautions at issue concern Defendants' use of PPE and testing as countermeasures to prevent or mitigate the spread of COVID-19. These are the precise countermeasures mentioned in the PREP Act Declaration issued to address COVID-19.

44.     Furthermore, Plaintiffs allege that Defendants failed to prevent Ms. Barreiro  from contracting COVID-19. (Exhibit A, ¶¶ 45-52, 58-61, 65-67, 71-74, 85, 89.) Such claim by its nature arises out of Defendants' use, distribution, procurement and administration of covered countermeasures/qualified pandemic products used to

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

diagnose, mitigate, prevent, treat or cure the COVID-19 virus, or to limit the harm COVID-19 might otherwise cause thereby triggering application of the PREP Act.

45.     In addition, under the PREP Act, the Secretary may specify that liability protections are in effect only for Covered Countermeasures obtained through a particular means of distribution. Section VII of Secretary Azar's initial March 10, 2020 Declaration provided that "liability immunity is afforded to Covered Persons only for Recommended Activities that are related to (a) Present or future federal contracts, cooperative agreements, grants, other transactions, interagency agreements, memoranda of understanding, or other federal agreements; or (b) Activities authorized in accordance with public health and medical response of the Authority Having Jurisdiction to prescribe, administer, deliver, distribute or dispense the Covered Countermeasures following a Declaration of an emergency." (See Defendants' RFJN Exhibit 2.)

46.     Secretary Azar's Fourth Amended Declaration amended Section VII of the Declaration. This Fourth Amendment provides that "***COVID-19 is an unprecedented global challenge that requires a whole-of-nation response that utilizes federal, state, and local-distribution channels as well as private-distribution channels. Given the broad scale of this pandemic, the Secretary amends [Section VII of] the Declaration to extend PREP Act coverage to additional private-distribution channels*** . . . ." [Emphasis added.] (See Page 12 of Defendants' RFJN Exhibit 5.)

47.     The Fourth Amended Declaration specifically provides that Section VII of the Declaration is amended to extend liability protection under the PREP Act to Covered Persons for Recommended Activities that are related to: "Covered Countermeasures that are:

i. Licensed, approved, cleared or authorized by the FDA (or that are permitted to be used under an Investigational New Drug Application or an Investigational Device Exemption) under the FD&C Act or PHS Act to treat, diagnose, cure, prevent, mitigate, or limit the harm from COVID-19, or the transmission of SARS-CoV-2 or a virus mutating therefrom; or

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

ii. A respiratory protective device approved by NIOSH under 42 CFR part 84, or any successor regulations, that the Secretary determines to be priority for use during a public health emergency declared under section 319 of the PHS Act to prevent, mitigate, or limit the harm from COVID-19, or the transmission of SARS-CoV-2 or a virus mutating therefrom."

(See Pages 22-23 of Defendants' RFJN Exhibit 5.)

48.     The PREP Act was designed to apply to individuals and entities responding to public health emergencies, and provides immunity for claims involving "covered countermeasures" under the Act. The broad definition of "administration of a covered countermeasure" set forth in Secretary Azar's declaration encompasses Defendants' plans and decisions with respect to how best to utilize and optimize supplies of PPE and COVID-19 testing kits, and whether and when the use of such countermeasures is appropriate. Moreover, during the relevant time frame to Plaintiffs claims, Defendants were subject to guidance/directives issued by the Centers for Disease Control and Prevention ("CDC"), Centers for Medicaid and Medicare Services ("CMS"), and the California Department of Public Health ("CDPH"), and was following this applicable public health guidance with respect to the use of PPE and COVID-19 testing. Defendants have thus established that it has immunity under the PREP Act as it relates to Plaintiffs claims relating to deficiencies in the use of PPE or COVID-19 testing.

## VII.   THIS CASE RAISES IMPORTANT FEDERAL ISSUES GRANTING FEDERAL QUESTION JURISDICTION OVER THE MATTER

49.     The healthcare community's response to this pandemic was coordinated at a national level by HHS, the CDC, the FDA and CMS, and entailed the issuance of detailed directives to healthcare providers to identify and sequester infected patients, which patients under investigation were to be tested, and the use of personal protective equipment. All cases positive for COVID-19 were reported to the CDC, and initially all testing was conducted solely through the CDC. This case involves issues of national importance related to Defendants' response to a national public health state of emergency, which has not been seen by this country in over a century. While

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4826-6732-4404.1

19

DEFENDANTS' NOTICE OF REMOVAL OF ACTION TO FEDERAL COURT

1   Plaintiffs do allege state causes of action, Plaintiffs claims relate to Defendants'
2   response to a national public health state of emergency, which has not been seen by
3   this Country in over a century.

4         50.    The federal courts have a substantial interest in determining the
5   application of the PREP Act in this matter. The PREP Act and its triggering immunity,
6   has been invoked in exceptionally rare circumstances since it was enacted in 2005.
7   The PREP Act and HHS Secretary's declarations confer a broad and sweeping
8   immunity to individuals and entities fighting the COVID-19 pandemic during this
9   declared state of emergency. The unique character of the COVID-19 virus as well as
10  its high communicability, required HHS to set forth an expansive declaration covering
11  broad categories of measures to fight the pandemic including COVID-19 testing and
12  PPE, all of which require interpretation as to the scope and application. Thus, there
13  can be no doubt that there is a substantial and compelling interest for the PREP Act
14  and the Secretary's declaration to be interpreted by the Federal Courts. Moreover, the
15  Federal Court is uniquely and properly positioned to interpret Congressional intent
16  and interests of the federal government.

17        51.    Federal jurisdiction is further appropriate as the state action "arises
18  under" federal law and raises a substantial federal issue, actually disputed and
19  substantial. *See Grable & Sons Metal Prods. v. Darue Eng'g & Mfg.*, 545 U.S. 308
20  (2005). In *Grable*, the Supreme Court set forth a two-step process for determining
21  whether a state law claim "arises under" federal law. First, the state law claim must
22  "necessarily raise a stated federal issue, actually disputed and substantial." *Id*. at 312.
23  Second, federal courts must be able to entertain state law claims "without disturbing
24  a congressionally approved balance of state and federal judicial responsibilities."
25  *Gunn v. Minton*, 568 U.S. 251, 258 (2013) (citing *Grable*, 545 U.S., at 313-14). The
26  claims here satisfy both prongs of the test for claims "arising under" federal law
27  established by the Supreme Court under *Grable*. Further, the federal court in retaining
28  jurisdiction would not disturb the balance of state and federal responsibilities. *Id*.

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

52.     The PREP Act immunity in this action completely preempts all state law claims, and its applicability poses a "substantial federal issue," which would serve to clarify and determine vital issues of law concerning the public health of the citizens of this country. The District Court, therefore, has original jurisdiction.

53.     Federal jurisdiction over Plaintiffs claims will not disturb federal-state comity principles under *Grable*. As set forth by the Secretary in his Fourth Amended Declaration: "Through the PREP Act, Congress delegated to me the authority to strike the appropriate Federal-state balance with respect to particular Covered Countermeasures through PREP Act declaration." Moreover, the plain, statutory language of the PREP Act expresses a strong federal interest and a clear intention to supersede or preempt state control of the issues raised by Plaintiffs Complaint. (*See* Defendants' RFJN Exhibits 30-32.)

54.     Congress did not intend the application of PREP Act immunity to be decided by state Courts. As such, this Court would not be disturbing or infringing on any balance of state and Federal judicial responsibilities by retaining jurisdiction. To the contrary, the plain language of the statute seeks to assert broad federal authority over the issues arising under the Act, and seeks to eliminate all semblance of State Court control. The Secretary's Fourth Amended Declaration makes explicitly clear that there is exclusive federal jurisdiction over lawsuits involving covered countermeasures, and that this "federal jurisdiction" is essential to the uniform provision of a national response to the COVID-19 pandemic and the PREP Act.

## VIII. JURISDICTION EXISTS PURSUANT TO THE FEDERAL OFFICER REMOVAL STATUTE (28 U.S.C. § 1442(A)(1)

55.     Removal is also proper under 28 U.S.C. § 1442(a)(1), which provides for removal when Defendants are sued for acts undertaken at the direction of a federal officer.

56.     "Unlike the general removal statute, the federal officer removal statute [Section 1442(a)] is to be 'broadly construed' in favor of a federal forum." *Durham v.*

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

*Lockheed Martin Corp.*, 445 F.3d 1247, 1252 (9th Cir. 2006) [noting the U.S. Supreme Court has held the right of removal is "absolute" for conduct performed under color of federal office, and "has insisted that the policy favoring removal 'should not be frustrated by a narrow, grudging interpretation of § 1442(a)(1).'"].

57.   The case is removable pursuant to Section 1442(a) because "(1) Defendants are  'persons' within the meaning of the statute; (2) Plaintiffs claims are based upon Defendants' conduct 'acting under' the United States, its agencies, or its officers as members of the nation's critical infrastructure; (3) Plaintiffs claims are 'for, or relating to' an act under color of federal office; and (4) Defendants raise a colorable federal defense to the Plaintiffs claims." *Stirling v. Minasian*, 955 F.3d 795 (9th Cir. 2020). All requirements for removal under § 1442(a)(1) are satisfied here.

58.   Defendants are "persons" under the federal officer removal statute pursuant to Section 1442(a)(1). *Goncalves v. Rady Children's Hosp. Los Angeles*, 865 F.3d 1237, 1245 (9th Cir. 2017); 1 U.S.C. § 1 [word "person" includes corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals].

59.   The "acting under" requirement, like the federal removal statute overall, is to be "liberally construe[d]" to cover actions that involve "an effort to assist, or to help carry out, the federal supervisor's duties or tasks." *Goncalves v. Rady Children's Hosp. Los Angeles*, 865 F.3d 1237, 1247 (9th Cir. 2017); *Ruppel v. CBS Corp.*, 701 F.3d 1176, 1181 (7th Cir. 2012) quoting *Watson v. Philip Morris Cos., Inc.*, 551 U.S. 142 (2007); see also *Defender Ass'n of Phila. v. Johnson*, 790 F.3d 457, 468 (3d Cir. 2015).

60.   To satisfy the second requirement ("acting under" a federal officer), "a private persons actions 'must involve an effort to assist, or to help carry out, the duties or tasks of the federal superior.'" *Watson v. Philip Morris Cos*., 551 U.S. 142, 152 (2007). Federal courts "have explicitly rejected the notion that a Defendant could only be 'acting under' a federal officer if the complained-of conduct was done at the

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4826-6732-4404.1                                    22
DEFENDANTS' NOTICE OF REMOVAL OF ACTION TO FEDERAL COURT

specific behest of the federal officer or agency." *Papp v. Fore-Kast Sales Co.*, 842 F.3d 805, 813 (3d Cir. 2016). This requirement, too, is to be liberally construed. *Watson*, 551 U.S., at 152.

61.     "[R]emoval by a 'person acting under' a federal officer must be predicated upon a showing that the acts that form the basis for the state civil or criminal suit were performed pursuant to an officer's direct orders or to comprehensive and detailed regulations. *Cf. Bakalis v. Crossland Savings Bank*, 781 F. Supp. 140, 144-145 (E.D.N.Y. 1991) ('The rule that appears to emerge from the case law is one of 'regulation plus....'") *Ryan v. Dow Chemical Co.*, 781 F. Supp. 934, 947 (E.D.N.Y. 1992) "This control requirement can be satisfied by strong government intervention and the threat that a Defendant will be sued in state court 'based upon actions taken pursuant to federal direction.'" See *Fung v. Abex, Corp.*, 816 F. Supp. 569, 572 (N.D. Cal. 1992). The "acting under" requirement is met when Defendants are acting pursuant to detailed and ongoing instructions from a federal officer. *Winters v. Diamond Shamrock Chem. Co.*, 149 F.3d 387 (5th Cir. 1998).

62.     Prior to the current national pandemic, regulation of nursing homes was very general in nature, requiring nursing homes to comply with certain quality of care rules and regulations. *See* 42 U.S.C. § 1396r, 42 U.S.C. § 1395i-3 and 42 C.F.R. § 483.1 through 42 C.F.R. § 483.95. The CMS also delegated oversight responsibility over these facilities to state surveyors, including the CDPH.

63.     In January, 2020, in response to the pandemic and the national state of emergency, CMS and the CDC, began issuing extremely detailed and pervasive directives to healthcare facilities as members of the nation's critical infrastructure and as part of the coordinated national effort to respond to and contain the COVID-19 pandemic. CDPH surveyors, contracted by CMS, were now supervising skilled nursing facilities with respect to all aspects of infection control and the pandemic response and ensuring strict compliance with the CMS directives. The issuance of in time and evolving guidance in response to a public health emergency was in contrast

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4826-6732-4404.1

23

DEFENDANTS' NOTICE OF REMOVAL OF ACTION TO FEDERAL COURT

to the role of CMS before the pandemic. Prior to the pandemic, the focus was on ensuring compliance with existing regulations. However, throughout the pandemic, CMS and CDPH as its agent, specifically instructed facilities to take or not take particular clinical and operational actions in the absence of finding deficiencies that would otherwise require the facility to develop its own plan of correction. These directives included the following:

A.    Early directives to skilled nursing facilities focused on monitoring residents and staff for symptoms and protecting healthcare providers from infection due to contact with symptomatic patients. Facilities were advised to adhere to standards for infection prevention and take steps to prepare for COVID-19.

B.    In January and February, 2020, the CDC issued a number of health updates regarding COVID-19, as well as criteria to guide the evaluation and testing of patients under investigation ("PUI") for COVID-19. Healthcare providers were advised to identify PUI based on clinical features, travel to an affected geographic region and contact with a person confirmed to have tested positive for COVID-19. Persons meeting the PUI criteria were to be tested and healthcare providers were advised to immediately notify their local or state health department in the event they were evaluating a PUI. State health departments in turn were instructed to immediately contact the CDC and complete a PUI case investigation form. Initially COVID-19 testing was conducted solely through the CDC. The CDC also instructed healthcare providers to use standard, contact and airborne precautions when interacting with PUI. (See January 8, 2020, CDC Health Update Outbreak of Pneumonia of Unknown Etiology (PUE) in Wuhan China, a true and correct copy of which is attached to Defendants' RFJN as Exhibit 11; January 17, 2020 CDC Interim Infection Prevention and Control Recommendations for Patients with Known or Patients Under Investigation for 2019 Novel Coronavirus (2019-n-coV) in a Healthcare Setting, a true and correct copy of which is attached to Defendants' RFJN as Exhibit 12; January 24, 2020 CDC Interim Infection Prevention and Control

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

Recommendations for Patients with Known or Patients Under Investigation for 2019 Novel Coronavirus (2019-n-coV) in a Healthcare Setting, a true and correct copy of which is attached to Defendants' RFJN as Exhibit 13.)

C.    On February 1, 2020, the CDC issued an "Update and Interim Guidance on the Outbreak of 2019 Novel Coronavirus" to provide further instruction to healthcare providers regarding 2019-nCoV 2019 (the 2019 Novel Coronavirus, now known as COVID-19). ***This instruction was part of the "ongoing US public health response . . . to identify and contain [the] outbreak and prevent sustained spread of 2019-nCoV in the United States"*** and addressed infection prevention and control specific to 2019-nCoV. [Emphasis added.] The CDC noted that the first United States case was identified on January 21, 2020, and had recently traveled from Wuhan, China. The CDC provided updated directives related to screening of patients in healthcare facilities, and coordination with local health departments for testing and reporting of results. The Update set forth the criteria for assessing patients for COVID-19. Persons with a confirmed or suspected COVID-19 infection who were hospitalized were to be evaluated and cared for in a private room with the door closed, ideally an airborne infection isolation room. (See February 1, 2020 CDC Health Update and Interim Guidance on the Outbreak of 2019 Novel Coronavirus (2019-n-coV), a true and correct copy of which is attached to Defendants' RFJN as Exhibit 14.)

D.    In January and February, the California Department of Public Health ("CDPH") issued a number of All Facilities Letters (AFLs) communicating directives issued by the CDC with respect to identification of PUI and infection prevention and control. (See AFL20-09, 20-10, 20-11, 20-13, and 20-15, true and correct copies of which are attached collectively to Defendants' RFJN as Exhibit 15.)

E.    On February 6, 2020, CMS began preparing healthcare facilities for the national response to the emerging 2019 Novel Coronavirus by issuing a Memorandum to State Survey Agency Directors (i.e., CDPH"). The memo directed

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4826-6732-4404.1

25

DEFENDANTS' NOTICE OF REMOVAL OF ACTION TO FEDERAL COURT

healthcare providers to adhere to CDC directives regarding the use of standard, contact and airborne precautions when interacting with PUI and advised facilities to have PPE measures and protocols in place. (See February 6, 2020 CMS Memorandum QSO 20-09-ALL, a true and correct copy of which is attached to Defendants' RFJN as Exhibit 16.)

F.      On February 28, 2020, the CDC issued a Health Update and Interim Guidance on the Outbreak of 2019 Novel Coronavirus (COVID-19) for healthcare providers. The Update noted that, to date, there had been limited spread in the United States. As of February 26, 2020, there were a total of 61 cases in the country, 46 of whom were repatriated person from high-risk settings. The CDC again included criteria to guide the evaluation and testing of patients under investigation ("PUI") for COVID-19. This update further instructed that patients with fever and signs/symptoms of lower respiratory illness without an alternative explanatory diagnosis and no identified source of exposure to the list of those who should be tested. At this time, testing was being performed at state public health laboratories and the CDC. (*See* February 28, 2020 CDC Health Update and Interim Guidance on Outbreak of Coronavirus Disease 2019 (COVID-19), a true and correct copy of which is attached to Defendants' RFJN as Exhibit 17.)

G.      On or about March 3, 2020, the CDC issued "Strategies to Prevent the Spread of COVID-19 in Long-Term Care Facilities (LTCF)." This publication, issued specifically to facilities like AG Redlands, reiterated that standard, contact and droplet precautions with eye protection were to be used in the care of residents with an undiagnosed respiratory infection. Facilities were advised to make PPE, including facemasks, eye protection, gowns and gloves available immediately outside the resident's room and to post signs on the door or wall outside the room of the residence to clearly describe the type of precautions needed and the required PPE. (*See* CDC "Strategies to Prevent the Spread of COVID-19 in Long-Term Care Facilities

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1  (LTCF), a true and correct copy of which is attached to Defendants' RFJN as Exhibit
2  18.)

3           H.      On March 3, 2020, CDPH communicated, via its All Facilities
4  Letters, information contained in the CDC February 28, 2020 Interim Guidance and
5  the CDC's March 3, 2020 guidance to long term care facilities in AFL 20-17. (*See*
6  CDPH AFL 20-17, a true and correct copy of which is attached to Defendants' RFJN
7  as Exhibit 19.)

8           I.       On March 4, 2020, CMS issued a Memorandum to State Survey
9  Agency Directors regarding Infection Control and Prevention of Coronavirus Disease
10 2019 (COVID-19) in nursing homes. The State Survey Agency, as agent for CMS,
11 was also responsible for disseminating the contents of the QSO memo to the States'
12 nursing homes. Facilities were told to screen visitors for international travel,
13 symptoms of respiratory infection, and contact with someone with or under
14 investigation for COVID-19, and to restrict entry of visitors who meet these criteria.
15 Facilities were advised to screen staff for the criteria as well, and that staff who meet
16 the criteria should not report to work. The CMS instructions also included directions
17 as to when to transfer a resident with a suspected or confirmed COVID-19 infection
18 to a hospital, and under what conditions a nursing home may accept patients
19 diagnosed with COVID-19. CMS advised facilities to follow the available CDC
20 guidance regarding infection prevention and control. (*See* CMS Memo QSO 20-14-
21 NH, a true and correct copy of which is attached to Defendants' RFJN as Exhibit 20.)

22          J.       On March 8, 2020, the CDC issued further Updated Guidance on
23 Evaluating and Testing Persons for Coronavirus Disease 2019 (COVID-19). The
24 CDC advised that with the expanding spread of COVID-19, additional areas of
25 geographic risk were being identified and the criteria for considering testing were
26 being updated to reflect this spread. The Update indicated that additional COVID-19
27 testing was becoming available in clinical laboratories and the CDC had been
28 specifically directing which persons could be tested.  (*See* March 8, 2020, the CDC

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1   issued further Updated Guidance on Evaluating and Testing Persons for Coronavirus
2   Disease 2019 (COVID-19), a true and correct copy of which is attached to
3   Defendants' RFJN as Exhibit 21.)

4        K.    On March 10, 2020, the CDC issued Interim Infection Prevention
5   and Control Recommendations for Patients with Suspected or Confirmed Coronavirus
6   Disease 2019 (COVID-19) in Healthcare Settings. The publication reiterated the
7   directive regarding use of standard and transmission-based precautions, and directed
8   healthcare providers who enter the room of a patient with known or suspected COVID-
9   19 to adhere to standard precautions and use a respirator or facemask, gown, gloves
10  and eye protection. The CDC advised that patients with known or suspected COVID-
11  19 should be cared for in a single-person room with the door closed. Airborne infection
12  isolation rooms were to be reserved for patients undergoing aerosol generating
13  procedures. This CDC publication also noted that "[m]ajor distributors in the United
14  States have reported shortages of PPE, specifically N95 respirators, facemask and
15  gowns." Based on a local and regional shortages of PPE, the CDC advised that
16  facemasks were an acceptable alternative when the supply chain of respirators cannot
17  meet the demand. Facilities were instructed to prioritize respirators for situations
18  where respiratory protection is most important. The CDC further advised that in the
19  event of a shortage of medical gowns, gowns should also be prioritized for aerosol
20  generating procedures. (*See* March 10, 2020, the CDC issued Interim Infection
21  Prevention and Control Recommendations for Patients with Suspected or Confirmed
22  Coronavirus Disease 2019 (COVID-19) in Healthcare Settings a true and correct copy
23  of which is attached to Defendants' RFJN as Exhibit 22.)

24       L.    On March 10, 2020, CMS issued a Memorandum providing an
25  update regarding the PPE recommendations issued by the CDC on March 10. (*See*
26  CMS Memo QSO 20-17-ALL a true and correct copy of which is attached to
27  Defendants' RFJN as Exhibit 23.)

28

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4826-6732-4404.1

28

DEFENDANTS' NOTICE OF REMOVAL OF ACTION TO FEDERAL COURT

M. On March 11, 2020, CDPH issued an All Facilities Letter notifying long-term care facilities of the latest CDC and CMS directives for infection control and prevention and the March 4, 2020 visitation restrictions issued by CMS. (*See* CDPH AFL 20-22, a true and correct copy of which is attached to Defendants' RFJN as Exhibit 24.)

N. On March 13, 2020, President Trump declared the COVID-19 outbreak a national emergency. Following this proclamation, the CDC and CMS took swift action to waive restrictions and expand capacity for healthcare providers and suppliers to coordinate the national response to the nationally declared state of emergency. On March 13, 2020, CMS issued revised infection control and prevention directives for nursing homes to prevent the transmission of COVID-19. In the Memo, facilities were ordered to restrict visitation of all visitors and non-essential health care personnel, cancel communal dining and all group activities, implement active screening of residents and staff for fever and respiratory symptoms, and screen all staff at the beginning of their shift for fever and respiratory symptoms. Facilities were ordered to continue to follow applicable CDC guidelines. (*See* CMS Memo QSO 20-14-NH a true and correct copy of which is attached to Defendants' RFJN as Exhibit 25.)

O. On March 17, 2020, the CDC issued documents containing instructions to optimize the supply of PPE such as eye protection, isolation gowns, N95 respirators and face masks. For facilities in contingency capacity, the CDC advised that extended use of facemasks should be implemented and that the use of facemasks should be restricted for use by healthcare providers rather than patients for source control. During crisis capacity, facilities were to prioritize facemasks for use during activities where prolonged face-to-face or close contact with a potentially infectious patient is unavoidable, exclude healthcare providers at higher risk for severe illness from COVID-19 from contact with known or suspected COVID-19 patients, use a face shield with no mask, and in settings where facemasks were not

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4826-6732-4404.1
29
DEFENDANTS' NOTICE OF REMOVAL OF ACTION TO FEDERAL COURT

available, use homemade masks. In the document pertaining to optimizing the use of N95 respirators, the CDC advised that (1) if the healthcare provider was to remain 6 feet away from a symptomatic patient, no facemask or N95 respirator was required; (2) if the healthcare provider was to be within 3 to 6 feet of a symptomatic patient, a facemask should be used; and (3) if the healthcare provider was to be within 3 feet of a symptomatic patient including providing direct patient care, an N95 respiratory should be used if available. When an N95 respirator was not available, healthcare providers were instructed to wear a surgical mask and exclude healthcare providers at higher risk from severe illness from contact with an infectious patient. (True and correct copies of these documents are attached collectively to Defendants' RFJN as Exhibit 26.)

P.    On March 20, 2020, CMS issued a memo entitled Prioritization of Survey Activities. In the memo, CMS advised that CMS surveyors would be conducting targeted infection control surveys of providers identified in collaboration with the CDC and the HHS Assistant Secretary for Preparedness and Response to ensure providers are implementing actions to protect the health and safety of individuals to respond to the COVID-19 pandemic. **A skilled facility would be subject to citation, and fines for failure to implement the directives from CMS. Thus, the directives from CMS (which followed and instructed facilities to follow the CDC guidance) were truly mandates**, not recommendations. (*See* CMS Memo QSO 20-20-ALL, a true and correct copy of which is attached to Defendants' RFJN as Exhibit 27.)

Q.    On March 21, 2020, the CDC issued further guidance specifically aimed at long term care facilities entitled "Preparing for COVID-19: Long-term Care Facilities Nursing Homes." In this publication, nursing homes were advised to restrict visitation, restrict all volunteers and nonessential healthcare personnel, cancel group activities and communal dining, implement active screening of residents and healthcare providers for fever and respiratory symptoms, and make

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

PPE available in areas where resident care is provided and place a trash can near the exit inside the resident's room so staff can discard PPE prior to exiting. The CDC further directed that "residents with known or suspected COVID-19 do not need to be placed in an airborne infection isolation room (AIIR) but should ideally be placed in a private room with their own bathroom. Room sharing might be necessary if there are multiple residents with known or suspected COVID-19. As roommates of symptomatic residents might already be exposed, it is generally not recommended to separate them in this scenario." (*See* March 21, 2020, CDC publication entitled "Preparing for COVID-19: Long-term Care Facilities Nursing Homes," a true and correct copy of which is attached to Defendants' RFJN as Exhibit 28.)

        R.    On April 2, 2020, CMS issued new instructions directed towards long-term care facilities to "mitigate the spread" of COVID-19. CMS noted that "[l]ong-term care facilities are a critical component of America's healthcare system…In recent weeks, CMS and CDC, at President Trump's direction have worked together to swiftly issue unprecedented targeted direction to the long-term care facility industry, including a general prohibition of visitors implemented on March 13, 2020, as well as strict infection control and other screening recommendations." CMS and the CDC were providing "critical, needed leadership for the Nation's long-term care facilities to prevent further spread of COVID-19" and that long term care facilities were to immediately implement symptom screening for all persons (residents, staff, visitors, outside healthcare workers, vendors, etc.) entering a long term care facilities. Facilities were ordered to specifically ask about COVID-19 symptoms and to check the temperature of all visitors, as well as limit access points and ensure that all accessible entrances have a screening station. Every resident was also to be assessed for symptoms and have their temperature checked every day, and patients and residents entering facilities screened for COVID-19 through testing, if available. CMS ordered facilities to ensure all staff are using appropriate PPE when interacting with residents to the extent PPE is available and per CDC guidance on the conservation of

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1   PPE. CMS further directed long term care facility staff to wear a facemask while in
2   the facility for the duration of the state of emergency, to wear full PPE for the care of
3   any resident with known or suspected COVID-19, and if COVID-19 transmission
4   occurs in the facility, healthcare personnel were to wear full PPE in the care of all
5   residents irrespective of COVID-19 diagnosis and symptoms. Further, to avoid
6   transmission within long-term care facilities, the facilities were advised to use separate
7   staffing teams for COVID-19 positive residents to the best of their ability, and to work
8   with State and local leaders to designate separate facilities or units within a facility to
9   separate COVID-19 negative residents from COVID-19 positive residents and
10  individuals with unknown COVID-19 status. (A true and correct copy of this April 2,
11  2020 CMS Directive is attached to Defendants' RFJN as Exhibit 29.)

12      64.     Through the federal directives issued by the CDC, CMS, and the CDPH
13  surveyors contracted by CMS, federal authorities were making the operational
14  decisions as it related to the clinical pandemic response in skilled nursing facilities.
15  Facilities were ordered to restrict visitation, cancel communal dining, implement active
16  screening and staff for fever and respiratory symptoms, screen staff at the beginning
17  of their shift for fever and respiratory symptoms and actively take their temperature
18  and document the absence of shortness of breath and any new or change in cough and
19  sore throat. Facilities were instructed on which patients and staff to test for COVID-
20  19, under what circumstances to use and how to conserve PPE, when to permit staff
21  who had COVID-19 to return to work, and how to handle the isolation of residents
22  infected with COVID-19 and those under investigation for COVID-19.

23      65.     These very detailed clinical directives and instructions represented a
24  marked departure from the regulatory structure which existed before the pandemic.
25  Moreover, as acknowledged by HHS in the Fourth Amended Declaration: "COVID-
26  19 is an unprecedented global challenge that requires a whole-of-nation response that
27  utilizes federal, state and local-distribution channels as well as private-distribution

28

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4826-6732-4404.1

32

DEFENDANTS' NOTICE OF REMOVAL OF ACTION TO FEDERAL COURT

1   channels [for the provision of covered countermeasures].” (*See* page 12 of
2   Defendants' RFJN Exhibit 5.)

3       66.     This oversight is analogous to *Fields v. Brown*, No. 6:20-cv-00475, 2021
4   WL 510620 at *3 (E.D. Tex. Feb. 11, 2021), which held that a Tyson Foods
5   meatpacking facility was “acting under” the direction of a federal officer because
6   Tyson Foods “exhibited ‘an effort to help assist, or carry out, the duties and tasks’” of
7   the federal government by “working directly with the Department of Agriculture and
8   the [Food Safety and Inspection Service] to guarantee that there was an adequate food
9   supply” during the COVID-19 pandemic.

10      67.     At all relevant times Defendants, as part of the nation's critical
11   infrastructure, were acting at the specific direction of federal authorities to address the
12   on-going federal effort and national state of emergency to contain the COVID-19
13   pandemic, and prevent the spread of the virus. All actions taken by Defendants in
14   preparation for and response to the COVID-19 pandemic were taken in that critical
15   role “in an effort to assist, or help carry out, the duties or tasks” as ordered by the CDC
16   and CMS, and CDPH surveyors (per the contract with CMS), and performed pursuant
17   to the direct orders and comprehensive and detailed directives issued by these
18   agencies. Defendants were acting at the direction of the federal government to prevent,
19   treat and contain COVID-19 at the facility and in its care and treatment of Ms.
20   Barreiro.

21      68.     In addition, the federal government enlisted senior nursing communities
22   in its efforts to fulfill the government's task of ensuring that facilities such as AG
23   Redlands could assist in the safe transfer and admission of patients between healthcare
24   facilities during an unprecedented national crisis. Therefore, Defendants at all relevant
25   times acted “to assist, or to help carry out, the duties or tasks of the federal superior,”
26   by helping the federal government “fulfill other basic governmental tasks” that
27   otherwise “the Government itself would have had to perform.” *Watson v. Philip*
28   *Morris Cos.*, 551 U.S. 142, 152 (2007).

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

69.     Defendants can also establish a causal nexus between Plaintiffs' claims and the actions it took were under federal direction. *Winters v. Diamond Shamrock Chemical Co.*, 149 F.3d 387, 398 (5th Cir. 1998). Here, Plaintiffs allege that due to the wrongful acts and omissions of Defendants, Ms. Barreiro became infected with COVID-19 during her residency at AG Redlands, and died on May 2, 2020. (**Exhibit A, ¶¶ 45-52, 58-61, 65-67, 71-74, 85, 89.**) Defendants' response to the COVID-19 pandemic as it relates to the claims of Plaintiffs (i.e., the care and treatment of Ms. Barreiro) was directly related to the orders and directives issued to it as members of the nation's critical infrastructure by the federal government. There is a clear causal nexus between the claims against Defendants and the actions taken by Defendants in that role at the direction of the federal government including, but not limited to, the direction of CDC, CMS, as well as by representatives of CDPH, the State Survey Agency acting under contract with CMS, with respect to the response to the pandemic at the facility and the administration of care to Ms. Barreiro. The nexus element is therefore met as Defendants were following the orders/directives of CMS with regard to infection control, COVID-19 testing and the use of PPE as part of the nation's critical infrastructure.

70.     To avoid any   doubt on these points, the Secretary amended the Declaration Under the Public Readiness and Emergency Preparedness Act for Medical Countermeasures Against COVID-19 and Republication of the Declaration, 85 Fed. Reg. 79190 for the fifth time on January 28, 2021, a sixth time on February 16, 2021, and a seventh time on March 11, 2021, confirming in all three amendments that the PREP Act is a complete preemption statute. See 86 Fed. Reg. at 7874, Defendants' RFJN Exhibits 30, 33, and 34.

71.     At all relevant times, Defendants in the present action, in its preparation and response to the COVID-19 outbreak, were acting at the specific instruction and oversight of the federal government, specifically the HHS, CMS, and CDC in responding to a federal effort to address the ongoing national state of emergency.

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4826-6732-4404.1                                    34
DEFENDANTS' NOTICE OF REMOVAL OF ACTION TO FEDERAL COURT

Defendants' actions were taken "in an effort to assist, or to help carry out, the duties or tasks" dictated by the CDC and CMS in responding to the COVID-19 pandemic.

72. Defendants' actions and conduct were taken due to unprecedented and "strong government intervention" which went beyond the "mere auspices of federal direction." *See Fung v. Abex Corp.*, 816 F. Supp. 569, 572 (N.D. Cal. 1992).

73. Defendants were acting specifically at the direction and under the supervision of the United States government with respect to various countermeasures implemented to prevent and treat the COVID-19 virus, including following evolving and specific guidelines from CMS and CDC with respect to: (1) infection control policies and procedures; (2) PPE procurement; (3) PPE allocation; (4) admission and discharge of residents; (5) managing visitors and outside persons, (6) staffing allocation and retention; (7) isolation protocols and management, among multiple additional directives. Thus, Defendants' response to the COVID-19 outbreak as it relates to Ms. Barreiro was directly related to *what they were asked to do* by the federal government.

74. Defendants also meet the requirement to assert colorable federal defenses. For purposes of removal, the defense must be "colorable" and need not be "clearly sustainable" as the purpose for the removal statue is to secure the validity of the defense may be tried in federal court. *Willingham v. Morgan*, 395 U.S. 402, 407 (1969). The colorable federal defense element is met where Defendants allege their actions were justified as Defendants were complying with federal directives with respect to the alleged wrongful acts. See *Venezia v. Robinson*, 16 F.3d 209, 212 (7th Cir. 1994); and *Mesa v. California*, 489 U.S. 121, 126-127. See also *Rural Community Workers Alliance v. Smithfield Foods, Inc.*, No. 5:20-CV-06063-DGK 2020 WL 2145350 (W.D. Mo. May 5, 2020) finding that compliance with federal guidelines aimed to protect employees from COVID-19 exposure served as a defense to civil liability. Here, Defendants were complying with Federal directives and

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

regulations issued by CMS, the CDC, and CDPH, the CMS contracted state surveyors, in responding to all aspects of the COVID-19 pandemic.

75. As a colorable defense, Defendants also assert an immunity defense under the PREP Act as set forth at 42 U.S.C. 247d-6d(a)(1), which provides Defendants with immunity, as "covered persons," from "suit and liability under Federal and State law with respect to all claims for loss caused by, arising out of, relating to, or resulting from the administration to or the use by an individual of covered countermeasure" provided there has been a declaration issued by the Secretary of HHS with respect to such countermeasure, which was issued on March 10, 2020 with regard to the COVID-19 pandemic. (*See* Defendants' RFJN Exhibit 2).

76. Plaintiffs Complaint alleges that Defendants failed to prevent Ms. Barreiro from contracting COVID-19. Plaintiffs claim relate to Defendants' administration and/or use of covered countermeasures and qualified pandemic products, including PPE, and COVID-19 testing kits, used to diagnose, mitigate, prevent, treat or cure COVID-19 or to limit the harm COVID-19 might otherwise cause–and therefore falls under the PREP Act. Thus, the claims fall under the PREP Act, triggering Defendants' immunity from liability for the claims in this action.

## IX.   NO WAIVER

77. Nothing in this Notice of Removal shall be interpreted as a waiver or relinquishment of Defendants' right to petition the court to compel arbitration or assert any defense or affirmative matter including, without limitation, the defenses of (1) lack of jurisdiction over a person; (2) improper venue; (3) insufficiency of process; (4) insufficiency of service of process; (5) failure to state a claim; or (6) any other procedural or substantive defense available under state or federal law.

78. Removal to federal court is proper in this case and the undersigned counsel for Defendants have read the foregoing and signs this Notice of Removal pursuant to Fed. R. Civ. P. 11, as required by 28 U.S.C. § 1446(a).

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1      **WHEREFORE**, Defendants respectfully remove this action from the Superior

2  Court of California, County of San Bernardino, to this Court pursuant to 28 U.S.C. §§

3  1331, 1441, and 1446, and provides Plaintiffs of notice of same. Should any question

4  arise as to the propriety of this removal, Defendants respectfully request an

5  opportunity to provide further briefing and oral argument.

6  DATED:  August 6, 2021            LEWIS BRISBOIS BISGAARD & SMITH LLP

7             By:   */s/ Rita R. Kanno*

8                  Kathleen M. Walker
                   Lann G. McIntyre

9                  Rita R. Kanno
                   Attorneys for Defendants

10                 AG REDLANDS LLC, AG FACILITIES
                   OPERATIONS, LLC, and JACOB WINTNER

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

37

DEFENDANTS' NOTICE OF REMOVAL OF ACTION TO FEDERAL COURT

1

2

**CERTIFICATE OF SERVICE**
*Barreiro, et al. v. AG Redlands, LLC, et al.*
USDC-Central District, Case No.

3 STATE OF CALIFORNIA, COUNTY OF SAN DIEGO

4
5
6

At the time of service, I was over 18 years of age and not a party to the action. My business address is 550 West C Street, Suite 1700, San Diego, CA 92101. I am employed in the office of a member of the bar of this Court at whose direction the service was made.

7 On August 6, 2021, I served the following document:

8 **DEFENDANTS' NOTICE OF REMOVAL OF ACTION TO FEDERAL COURT PURSUANT TO 28 U.S.C. §§ 1331, 1441, 1442 AND 1446**

9
10

I served the document on the following persons at the following address (including a fax number and email addresses, if applicable):

| Allen R. Oghassabian<br>Christian R. Oliver<br>The Barnes Firm, LC<br>655 W. Broadway, Suite 940<br>San Diego, CA 92101<br>***Attorney for Plaintiffs*** | Tel: 800.800.0000<br>Fax: 888.800.7050<br>Email:<br>allen.oghassabian@thebarnesfirm.com<br>christian.oliver@thebarnesfirm.com |
|---|---|

15 The document was served by the following means:

16
17

☒ **(BY COURT'S CM/ECF SYSTEM)** The document was served by CM/ECF (excluding those not registered for CM/ECF who were served by mail or email, if applicable).

18
19
20

☒ **(BY ELECTRONIC TRANSMISSION ONLY)** Only by emailing the document to the persons at the email addresses listed above based on notice provided on March 16, 2020 that, during the Coronavirus (COVID-19) pandemic, this office will be working remotely, not able to send physical mail as usual, and is therefore using only electronic mail. No electronic message or other indication that the transmission was unsuccessful was received within a reasonable time after the transmission.

21
22

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

23 Dated: August 6, 2021

*/s/ Kimberly Dammeyer*

Kimberly Dammeyer

24

25

26

27

28

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

4826-6732-4404.1